Operating Partnership, and Ms. Lindauer. Your Honor, and I did ask to reserve five minutes for rebuttal. Your Honor, Joyce Lindauer here on behalf of Whitestone Uptown Tower, LLC, the appellant, and Ms. Lindauer.  In this matter, may it please the court. We're going to talk about something that's a little more esoteric than some criminal cases that you heard this morning. This one deals with some bankruptcy issues that have really not been fully addressed by the Fifth Circuit, which is one of the primary reasons why we were pursuing this particular appeal, because we felt like there was a bit of a void in the Fifth Circuit dealing with the questions under 11 U.S.C. Section 509, which is the bankruptcy code section dealing with a claim for segregation made by a party in connection with a bankruptcy proceeding. The primary disagreement, Your Honor, seems to be between the provisions of the bankruptcy code themselves, 11 U.S.C. Section 509, and in this case, Texas state law. And for the reference, the guarantee agreement, which focuses predominantly in this matter, is governed by Texas state law. That's what it specifically provides by its very terms. So how much of this matter, if any, involves priorities in the bankruptcy regime? So this claim, if allowed, for the $13.6 million, was filed as a secured claim. That was the request made, is that it be treated as a secured claim. So not only was the claimant seeking to recover the monies that they had paid, but they were also asking to take on the secured status of what ended up being Rialto, started as Morgan Stanley. So the claimant here, WROP, White Stone Reed Operating Partnership, would have made a claim as a secured claimant. That would be a higher priority, obviously, than unsecured or a priority claimant in a bankruptcy proceeding. So they basically – It ends up – it seems that it matters in terms of standing. That is to say, what difference does it make if it's a matter of priority? Then maybe they get more, maybe they get less. Right. But if it's only a transfer from one entity to the other, then maybe there would be no standing because it doesn't matter. There's nothing at issue. Yeah. I hear you, Your Honor. I think it does matter in the sense that – and just a little background here. The property that Uptown Tower owned in Dallas, Texas, was an office building, not specifically in downtown. It was in a neighborhood called Uptown. The office building ultimately sold, and because WROP requested status as a secured creditor, they made a claim to be paid when the building was sold. Now, there was enough money when the building was sold to pay that claim as well as other creditors in the case. So the creditors in that case were paid. The reason it becomes important is at the end of the day, if they're not entitled to a right of segregation, that was their basis for the claim they filed in the bankruptcy case itself. You have a copy of their proof of claim. That was the sole basis of their claim. We argued that no, because they were ultimately a partner in a partnership with companion-related parties, that ultimately their claim could be treated as a contribution, and that would make a significant difference because then, as a contributing party or partner, they would be subordinated to all the other claims in the case. So if you win this appeal, who receives money they otherwise would not receive? So the equity owners of Whitestone Uptown, which is an entity called P-ROP, Pillarstone Reed Operating Partnership, would then be entitled to the money from this particular appeal. That would be the position that we would take, that they are the ultimate owner of this entity, and as the owner of the entity, they would be the recipient of the funds. So that would be where the money would ultimately go. Now, where it goes after that might be a decision for the bankruptcy judge to make. Ultimately, this case is still open. It's still an open bankruptcy case. It has not been closed. So the bankruptcy judge would still have some management, if you will, or administration over this particular matter. We're here really on the just very, I think it's a fairly narrow question, of whether WROP was entitled to claim a right of segregation. A couple of things I wanted to point out. The bankruptcy judge, we believe, made an error in her original order. The way this was presented to the bankruptcy court was on an objection to a proof of claim. You have a copy of the claim as part of the court's record. The only claim that WROP made was based on a right of segregation. They did not base their claim on any other theory of recovery other than that. What the bankruptcy judge found in her findings was that WROP, as guarantor, was secondarily liable with the debtor for the loan. That's incorrect. WROP was not secondarily liable. They were primarily liable just as was the debtor for the repayment obligations. And you find that in the guarantee document itself. Section 13 of the guarantee agreement specifically provides that this is a guarantee of payment and not of collection. And as such, it goes on to say that WROP is primarily liable to the claimant that was making the claim based on the guarantee. You'll find that reference in the record. It's in the record at 274. It's a copy of the guarantee itself. And it's very specific as to its terms, and it made the guarantor, White Stone Reef Operating Partnership, it was a continuing guarantee and shall be absolute under any and all circumstances, et cetera. So if you follow through the argument, the argument is that WROP paid $13.6 million roughly, which was not the entirety of the debt. They paid a significant portion of the debt. What they ultimately received in exchange for that payment was a release. And that's why they received consideration. They should not have been given the right to step into the shoes of Morgan Stanley and assert a secured claim based on a debt that they were already 100% responsible to pay. And that's the reason we think there was an error here is under Texas law. Okay, so set aside 509 for a second. Under Texas law, this type of guarantee, and we cite you the cases, would never give rise to the ability to make a claim for segregation because you are paying a debt of your own. This would be no different than the debtor himself or itself paying off a debt it is responsible for and then coming back and saying, oh, I get the right to assert the claims of the secured creditor that I paid off. You can see how that doesn't make logically any sense that that would be the case. So, again, I think the key here is the actual terms of the guarantee themselves are so critical and can be distinguished from other cases that have ruled on these particular issues because the guarantee made WROP, White Star and Reed Operating Partnership, primarily liable. It was as liable as the debtor. It wasn't secondarily liable. It was primarily liable. Now, when it paid its 13-6, ultimately, because there was a settlement and you have those documents as part of the record, there was a settlement. Ultimately, WROP would get a release from Morgan Stanley. Now, they obtained a release of any liability that they had. They did not obtain an assignment of Morgan Stanley's position. They did not take on that role as secured creditor except for on this claim of segregation. And, Your Honor, we believe that – I'm going to ask you just to repeat yourself. It's not your fault, but you told us earlier that there was some refinement of issues of law that our circuit needs to look at. Right. Even if you're repeating yourself, tell us in one sentence or at a maximum in two sentences, what is the question of law that you think we need to resolve? I think the question of law is – and you do have a split amongst the bankruptcy courts, which I think is important for you to be aware of. The Southern District of Texas, Judge Itzker in particular, has taken one approach on these issues. The Northern District now, Judge Larson, has taken a different path on these issues. And we cite you those cases, but I think there is a split right now. But the legal question is, if you have an unconditional guarantee of payment, are you entitled to the benefits of Section 509 of the Bankruptcy Code? That's the legal question, is if you are primarily liable on that debt. No different than if you were the debtor itself. You are primarily liable, liable number one, on that debt. So that the creditor could, and in this case did, actually sue WROP on their guarantee, which they had the right to do. They're primarily liable. And then ultimately, you would obtain a release of that liability, which they did through a compromise and settlement agreement that was approved by the bankruptcy court. Are you still entitled to a 509 request? And we say, no. That you satisfied a debt for which you were responsible, and you obtained valuable consideration in the form of a release. And why that's important is the numbers matter. And the reason I point that out is if you look at the, and you have this in the record, page 71, if you look at how much Morgan Stanley was actually asking for, Morgan Stanley was asking for $18,728,000. Now remember, WROP paid $13,600. They did not ever pay the entirety of the debt. They only paid a portion of the debt. But through the settlement agreement that they were given as part of an agreement to pay off the lender, they received a release. So they were released from liability for which they had not paid. And that's the reason I think that that is important, because they did not pay the debt in full. When we start talking about subrogation, we normally talk about payment of the debt in full. I want to step into your shoes having paid off your debt. But if I haven't paid off your debt, I've only paid a portion of that debt, do I still have the right to step into your shoes? And our argument is no. You do not have the right to step into my shoes. You didn't pay off the debt in full. So ultimately, the debt was settled, but only because of a partial payment and not a full payment. And that's another key issue here. When you talk about things like equitable subordination and whether there's an entitlement to that, not just 509, but whether there's an equitable claim for subrogation, the question or subordination, or subrogation, I'm sorry, there is a question there about what you have to actually pay. Have you paid the full amount or only part? So, Your Honor, we briefed that pretty heavily. And I think when you look at the law, the Texas law in particular, and these loan documents are governed under Texas law, if you look at the Texas law, there would be no entitlement, absolutely none, to a right of subrogation, none, zero. So the question, the legal question for the Fifth Circuit now is, does 509 of the Bankruptcy Code give creditors who have a claim for subrogation greater rights than they would otherwise be entitled to if there were no bankruptcy? If no bankruptcy had been filed, there would be no 509 claim, because 509 only applies in bankruptcy. So the question is, would they be entitled to what they've asked for? And, Your Honor, I think it's very clear under Texas law they would not, that you cannot step into the shoes under these set of facts. So the question is, is 509 doing something different than state law? That's really the question. Our position is that you have to be on a level playing field here. You can't get more benefit because you filed bankruptcy than you would get otherwise. But it wasn't WROP that filed bankruptcy. It was the debtor. Right, but WROP made the payment, the 13-6 payment, and then asked for a right of subrogation as it related to that particular payment. And they're using Section 509, not state law, because that gets into your equitable subrogation questions. They're using 509 of the bankruptcy code to say, we get a greater right than we would otherwise have. And I don't think that that's the way you should read 509. And I think the other telling thought is that they got consideration. Thank you. You say time for rebuttal, Ms. Lindauer? Yes, I did, Your Honor. Mr. Robertson? I can leave you my notes if you'd like them. They're all over the place. May it please the Court. My name is Drew Robertson, and along with Mr. John Cain, I represent the appellee WROP. This morning, Your Honors, I'll be addressing the initial question of the appellant's lack of standing, and then Mr. Cain will address the substantive merits questions arising under the bankruptcy code and the subrogation issue. Of course, Your Honors, you know that we have to consider subject matter jurisdiction before proceeding to anything else, and it's incumbent upon the Court to always be considering its own subject matter jurisdiction. Of course, an essential element of that jurisdiction is that the appellant has to have standing to be prosecuting the claim that they are attempting to bring. We've asserted that the appellant, while perhaps initially having standing in this case, has subsequently lost standing as a result of intervening acts that have occurred at the bankruptcy court, particularly a settlement agreement that was entered into between WROP and the planned administrator of several other bankruptcies. And I want to just walk through this briefly to make sure that the Court understands sort of the flow chart about how it is that the appellant has been deprived of standing. You heard my friend a moment ago admit in response to Judge Smith's question that if they are successful in this case, ultimately, the money is going to go to their parent entity, what we call the partnership or PROP. That's important because the parent entity, the partnership, is also in bankruptcy. And there is the settlement agreement that we've heard in the briefing. Appellant says, well, we're not party to that settlement agreement. We can't be bound by the settlement agreement. Respectfully, that's not really material because the partnership, the entity that is also in bankruptcy, is a party to the settlement, is bound by it. So just to explain the flow chart, the debtor, the appellant, has the second amended plan. That plan requires in Article 5, Class 7, it lays out a whole list of classes of claims that are going to be paid. And in fact, the building that was sold by the appellant recovered enough money to sufficiently pay all of those claims. So all the claimants have been paid. The result is that then you have Class 7, which is the equity claims. And so any of the money that's left over after all the claims have been paid are going to go to equity. They're going to flow up to the partnership. And in fact, opposing counsel conceded this before the bankruptcy court, as we noted in our brief, and explained there to Judge Larson, the building is going to be sold. All the money is going to flow up to PROP, just as was conceded here today. Let me ask you what I asked your friend on the other side. So if the debtor wins this appeal, does anyone other than WROP get more money? No, sir. They don't. And that's the important component here. The plan requires that the debtor give all the money to the partnership. And then the partnership has entered into a settlement agreement with my client, WROP, that says after the claims in that case have been paid, all the resulting money that's left in the partnership estate is going to be paid to WROP. So it's your position that the appeal is jurisdictionally dead because all economic roads eventually lead back to your client, WROP? That's right, Your Honor. As this Court noted in matter of JFK capital holdings, this Court applies the person of grieved test to determine standing to appeal a bankruptcy court order. And that test simply asks, is the appellant directly and adversely affected pecuniarily by the order of the bankruptcy court? That's what you have to have to have standing to appeal. Our position is that because all the money eventually is going to go all the way back around to WROP, there's no situation in which the appellant debtor keeps this money at the end of the day. Does the settlement agreement legally require all those residual funds to flow to WROP? Or is that just the expected practical outcome? No, Your Honor. It specifically requires it in Section 6, and that's page 5 of the settlement agreement. The debtor shall distribute all funds remaining in the partnership estate following the satisfaction of claims to WROP as soon as reasonably practicable. So the claims in the partnership estate have to be paid. Once those claims have been paid, and again, the sale of the building is going to flow all that money up to the partnership. Once those claims are paid, all remaining funds in the partnership estate, that would include the funds that are ultimately going to come from the appellant as a result of this litigation, get paid to WROP. And so at the end of the day, the appellant doesn't have a pecuniary interest. They're not affected by the order of the bankruptcy court because all the money is going to end up back in our pockets ultimately. Does the debtor have any discretion over the distribution of recovered funds after that Rule 9019 order? No, Your Honor, and that's because their own plan requires them to distribute the money up to the partnership as counsel conceded this morning. Specifically, in the second amended plan of reorganization, which is at page 386 of the record, Article 5, Class 7 says that once the allowed claims are paid, money is to get paid to the equity owners of the debtor. And Section 10.07 of that same plan says that that payment distribution is going to happen as soon as reasonably practicable. So the plan of the debtor in this case requires the money to flow up to the partnership. The settlement agreement requires the partnership to give that money to WROP. Therefore, there is no pecuniary interest in the appellant Black's standing. I'd like to just touch briefly on, while it wasn't covered by the debtor this morning, there is a motion for reconsideration to supplement the record that was carried with the case that this panel will consider. And so with my remaining few minutes, I'd just like to touch on that briefly. We, of course, filed a motion to supplement the record, seeking to submit the settlement agreement and the 1919 order and related documents to make the standing argument as part of the supplement. And that would be from a court record, is that right? It's from the bankruptcy court's own record, yes, Your Honor. Now, admittedly, it is from a different bankruptcy proceeding. It's from the partnership's bankruptcy proceeding as opposed to this debtor's proceeding. But it's the same bankruptcy court, and it goes to the issue of subject matter jurisdiction. So the clerk of the court granted that motion, allowed supplementation, and then the appellant has filed a opposed motion for reconsideration. And the motion for reconsideration argues that you should disregard the supplemental record because it wasn't part of the original record in the case. And, of course, the cases that they cite in their brief are cases such as, for example, Ghali v. United States and Pitchford v. Kane are the two that they heavily rely on. Now, those are cases where you have a bit of completely different factual situation. You have their- These are related cases, is your point? Yes, Your Honor. We're not simply- They're directly related cases. Directly related, and go directly to the issue of subject matter jurisdiction, which, of course, can never be waived. But the issue in those cases was the parties were trying to supplement the record with additional factual evidence, things like supplemental testimony from affidavits or a transcript from a state trial court. Those things are distinguishable here because all we're seeking to supplement the record with are documents that are already part of the bankruptcy court's record that go directly to the question of subject matter jurisdiction. And so for the reasons that we've argued there, we believe the motion for reconsideration should be denied, the court should retain the supplemental record, and, of course, the supplemental record goes to the issue of subject matter jurisdiction, which we believe is lacking here. So if the court doesn't have any further questions, I will pass it on to Mr. Cain to address-  You're going to give Mr. Cain two additional minutes. Yes, Your Honor. All right. Thank you. So he can buy your lunch, I guess, right? Your Honor, John Cain for the appellee. I'm definitely on the hook for lunch. I'm here to address the issues related to statutory subrogation under Section 509 of the Bankruptcy Code. And really, we do believe that this is an issue about statutory subrogation, not some interplay between common law tests for equitable subrogation. And we believe that because there's already guidance from the Fifth Circuit about how to handle an issue where there is a post-petition payment on a guarantee that drives down a note obligation, and that's in the case of Enri Corlin from this court in 1992. That court notes that a payment by a guarantor, because a guarantor is co-liable on a debt with a debtor, that paid down a loan, a note, that was owed by the debtor, gave rise to a claim for subrogation under Section 509A. And, Your Honor, we think that that's applicable in large part because any time there is a conflict between a statute and the interpretation of the statute and some kind of common law or state law test, the Supremacy Clause applies, and the application of federal statute reigns supreme. And that was specifically addressed in the decision of Enri Faisal Trading that we cited throughout our briefing. In that case, the court notes that if you have a conflict, if state law differs from the federal statute, you have to look to the statute. So this court in Enri Nowlin says, when you look to a statute, you look at the plain language of the statute. And you harmonize that with the other provisions of the statute so long as you don't get some kind of obscure or inane result. And so, Your Honor, what we would ask is that you simply look at the plain language of the statute. Section 509 of the Bankruptcy Code, and when I say the Bankruptcy Code, I'm referring to Title 11 of the United States Code, but 509 breaks down into essentially three provisions. A, which establishes the general broad rule for subrogation. B, which creates an exception to a party's right of subrogation. And then C, specifically addressing payment priorities under the Bankruptcy Code. And it falls within a series of provisions in the Bankruptcy Code under Chapter 5 that address payment priorities. But A essentially states that if a party is co-liable with the debtor on a claim that a creditor has against the debtor and issues a payment to drive down that claim, it is entitled to a right of subrogation. And I think, to Ms. Lindauer's point, that creates a broad opportunity for subrogation. It does. And it stems from pre-codification or pre-Bankruptcy Code codification doctrine of subrogation that was cited by the Fifth Circuit in Compagnia Anonima Venezolana and other cases that essentially states the doctrine of subrogation is a broad doctrine that is intended to prevent inequity and unjust enrichment. And so, if a guarantor, as in Corland, and the way the Corland court describes the guarantee is certainly an unconditional guarantee. There's actually a dispute in Corland about whether payments made were payments made on a guarantee or on a note. And the court determined that because the guarantee was primarily liable or it was right, the guarantor issued the payment subject to the guarantee and not on the underlying note. So, what the court essentially determined is that you have to have this doctrine of equitable subrogation or Section 5098 to prevent unjust enrichment. And those concepts are fairly simple. So, if I have a debtor, like the appellant in this case, and the debtor takes out a loan from J.P. Morgan, it's serviced by Rialto, we'll call it the lender. Lender provides, let's say, $20 million. The debtor has received $20 million and can go purchase this building and now has operating income from the building that it uses over time to pay down the debt obligation. Now, if it pays down the obligation, there's no need for any kind of subrogation, but if it defaults, the guarantor now comes in, comes out of pocket, did not receive any of the benefits of the loan and satisfies the obligation. You say there's entitlement to subrogation to avoid unjust enrichment. Who, which entity is it that would be unjustly enriched if we say no subrogation? The debtor. And the reason is, Your Honor, the debtor gets all of the benefits of the loan, right? It's able to use the loan proceeds. And the debtor is? It's entitled to use the loan proceeds. It gets the benefit of $15, $20 million, then it borrowed, and someone else pays off its liability. And if the subrogation claim is denied, the debtor essentially is richer by the amount of the loan proceeds that it received. So why then isn't there standing, if it matters as to how we might rule on subrogation? Your Honor, there's no standing because essentially the money all will eventually flow through to WROP. If the settlement agreement didn't exist, this would be a critical issue because WROP would be entitled to a claim, the satisfaction of its claim. But if it's a question, excuse me, I don't mean to interrupt you, but if it's a question of whether there's going to be unjust enrichment, then someone's going to be unjustly enriched and someone else is going to be having to suffer from that unjust enrichment. So I don't understand how overall you can say that there's no standing in this case for this matter to be pursued in court. Sure, Your Honor. And let me try and walk through that issue because it truly is just a fun, slow issue. And it relates to the unique circumstances of this case and the existence of the settlement agreement between the partnership entity and WROP in the partnerships bankruptcy case. So generally, the doctrine of subrogation would create unjust enrichment in a situation like this if the guarantor was denied a right to recover against the debtor's estate. The reason that's not the case here and the reason that this is essentially moot or there's no standing is because right now, WROP has a paid senior secured claim. It stepped into the shoes of the lender. The property was sold. As the lien holder, it received the payment. If it was determined not to be a secured creditor and dropped down to being an unsecured creditor, well, luckily, there were sufficient proceeds from the sale of the building to pay all creditors in full and to have a surplus available for issuance to the equity interest holder. So even if we had an unsecured claim, some form of contribution claim or the like, we'd still be paid in full. If our claim was denied, which is the alternative relief requested by the appellant in its claim objection to WROP's claim, and we had WROP, a $0 claim in the case, then there would essentially be the amount of money that we'd disgorge back into the estate, so $13.6 million, added to the surplus that is already going to be paid into the partnership estate. And so instead of saying $2, $3, $4 million goes to the partnership and is distributed to WROP, now there's that amount of money plus the $13.6 that my client disgorges. It's paid up into the partnership estate, and then under the settlement agreement, it has to be distributed back to WROP. And so in a normal situation, there would be unjust enrichment. In this case, because of the existence of a settlement agreement in the partnership's bankruptcy case, the money is all going to essentially flow back to WROP. No, and I do understand, Your Honor. Whether it's a person aggrieved, or whether it's, you know, is there any way that this debtor's estate can benefit from the outcome of this litigation, mootness, I think any way you slice it, it is our position that this appeal is unnecessary because of the way funds flow through to WROP. We do think that from a merits perspective, though, this idea of whether there's primary liability or secondary liability is not a real issue. And the district court, Judge Starr, noted that, citing to the statute in page 3 and 4 of his memorandum opinion, basically said, look, if we turn and look to the statute, the only way you have an exception where there is co-liability in a payment by a guarantor is if the guarantor received, under Section 509B, the consideration, stressing that the not some consideration, not consideration for a release, but the consideration that gave rise to the lender's claim against the debtor. In essence, was there a consideration that flowed through from the loan that the debtor took out that it was obligated to repay? Judge Larson and Judge Starr, both assessing the facts, determined that that consideration did not flow through to WROP, and so it would not be accepted from a subrogation claim under 509B. And I see my time is about to expire, but I did want to address one issue. Okay, well, I appreciate that. I know Ms. Lindauer is trying to interpose this idea of primary liability, or someone who is primarily liable under an unconditional guarantee under Texas law would not have an ability to assert a subrogation claim because it just paid one of its own debt obligations. But the case that we've cited, Freymire Engineering v. Jomar, addresses a situation in which an indemnitor under a contract has its own primary obligation as a matter of contract to pay an obligation that it owes to the indemnity. It paid the claim and still brought a subrogation claim against a product manufacturer whose product failure caused damage. And the Texas Supreme Court says, looking at a two-part test that actually did require someone to be primarily liable to... or not primarily liable to assert a right of subrogation, the Texas Supreme Court noted that, look, in subrogation situations, a party who is making a payment is always making a payment on some contract or agreement on which they have an obligation. So, of course, with an unconditional guarantee, a guarantor is making a payment to satisfy its guarantee obligation. But that doesn't mean it isn't also co-liable on a debt that is owed by another party. So in Freymire v. Jomar, Jomar, the product manufacturer whose product failed, had a plausible claim to satisfy the same damages that were satisfied by the indemnitor, Freymire Engineering. And so the Texas Supreme Court has essentially ruled on the argument that Ms. Lindauer is making and determined that it is not accurate. And it's consistent with footnote 14 in FISOL trading and also a quote asserted by FISOL trading in Dow Corning, which is essentially that a guarantor, of course, is an obligor, right? It is primarily liable on its guarantee, but it still has an obligation to pay the underlying note once there is a default. That condition precedent, there has to be a default by the note obligor, is what triggers the liability. And so a guarantor, even an unconditional guarantor, is paying a debt on which it is co-liable. It is paying a debt of another. And that triggers the 509A right of subrogation, without exception. I want to address the standing issue because they failed to address, I think, what's important. There is a lawsuit pending in front of Judge Larson, an adversary proceeding, where Whitestone Uptown Tower sued WROP for damages to the building that was sold. Okay? Very straightforward lawsuit. Breach of fiduciary duty and some other claims have been made. They filed with Judge Larson a motion to dismiss that adversary proceeding based on their position that Whitestone, or I'm sorry, Uptown, no longer has standing to pursue that adversary because they claim they're the ultimate beneficiary of any funds that would flow out of that lawsuit. Judge Larson has that issue under advisement right now. And the reason I point that out is because I think this question of standing belongs to the bankruptcy judge to interpret the effect, if any, of her settlement agreement that she approved and what rights, if any, flow from that settlement agreement, which is what they're asking you to do, but they've already asked Judge Larson to do the same thing. And I think it belongs in the bankruptcy court, that issue, because the judge in the bankruptcy court is the one that approved this settlement that they think is dispositive. Let me tell you why the settlement is not dispositive. In any event, I think you should leave it to the bankruptcy judge to rule on what she has in front of her and not for you to rule on the question of standing. I think the points that the court has made are spot on, which is the ultimate recovery of the $13.6 million flows to the equity of the uptown debtor. Who was the holder of the equity of the uptown debtor? An entity called Pillarstone Operating Partnership. Now, what's important is Pillarstone Operating Partnership, as they mentioned, is a debtor in bankruptcy. At the time the bankruptcy was filed, WROP had 84% limited partnership interest in that entity. Its general partner, an entity called PREET, had a 16% interest. And that's in the first page of the settlement agreement. What happened when the settlement got approved is that that percentage materially changed. And what happened was PREET, because part of the settlement included their request to redeem their ownership in the partnership. So they now have less than 1% ownership in the partnership. So to answer the question correctly, where does the $13.6 go, it goes to the general partner of the partnership who now has 99% ownership of the partnership. It does not go to WROP. That exactly is the issue that we put in front of Judge Larson within the last month. The reason I say that's important is because if you look at the settlement agreement, uptown, the entity that's before you today, was not a party to that settlement agreement. It's not made a party. And when they talk about excess funds, what they're talking about is the buckets of dollars that Judge Larson approved to go to various groups of creditors. There is not one mention in that settlement agreement of this specific appeal and what happens to the money in this appeal. There is not one mention of what happens with that related lawsuit. And the reason I think that's important is because they are not the ultimate beneficiary of these dollars. The general partner, PREET, is. Because when the settlement got approved, it changed the partnership structure without ever mentioning these assets as belonging to WROP. We explained to Judge Larson this would be an incredible windfall for WROP to be able to wipe out two pieces of litigation, not only an appeal, but a lawsuit that were never part of the settlement agreement themselves. You have the settlement agreement in front of you, and I challenge you to find anywhere where it says uptown is a party to that agreement and that they're entitled to these funds should they flow back. So, Your Honor, I think there clearly is standing, but if you're concerned, the judge in the bankruptcy court has that issue under advisement right now on this exact question. The only thing we're asking you to do is determine that they had and should have no right of subrogation because they paid their own debt. Thank you.